# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | | |
|---|---|---|
| United States of America<br>v.<br>Willie Huerta<br><br>*Defendant(s)* | ) ) ) ) ) ) ) | Case No. 13-M-485 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **January 24, 2011,** in the county of **Milwaukee** in the **Eastern** District of **Wisconsin**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1512(c)(2) | Corruptly obstructing, impeding, or influencing an official proceeding. |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

*Complainant's signature*

FBI Special Agent Matthew Gibson
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **April 30th, 2013**

*Judge's signature*

City and state: **Milwaukee, Wisconsin** — William E. Callahan, Jr., U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Matthew Gibson, being first duly sworn on oath, on information and belief says:

## I. BACKGROUND, TRAINING, AND EXPERIENCE:

1. I have been a Special Agent of the FBI for approximately twenty one (21) years. I am currently assigned to the Milwaukee Office of the FBI. I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps. Based on my training, experience I believe there is probable cause that Detective Willie Huerta, Milwaukee Police Department, engaged in Obstruction of Justice in violation of Title 18, United States Code, Section 1512(c)(2) on January 24, 2011, and therefore submit this affidavit in support of a criminal complaint and arrest warrant.

2. This affidavit is based upon my personal knowledge and information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is based upon information provided by other law enforcement officers police reports, public records, subpoenaed records, cooperating citizen witnesses, informants, Wisconsin Department of Transportation (WDOT) records, telephone toll records, surveillance, consensually recorded conversations, and cooperating defendants, whose reliability is established separately herein.

## II. RELIABILITY OF CONFIDENTIAL INFORMANTS

3. Beginning in October 2011, case agents received information from a Confidential Source, CS 12-001, about drug trafficking activity in the Milwaukee area. On numerous dates between October 2011 and October 2012, CS 12-001 was interviewed and provided detailed information about the current and past drug-trafficking activities of subjects associated with this Drug Trafficking Organization (DTO), as well as with about individuals involved in the interstate transportation of stolen tractor-trailers which contained merchandise and food products. For several reasons, case agents believe CS 12-001 is reliable and credible. First, CS 12-001 has been providing information since October, 2011. Second, CS 12-001's information is substantially against CS 12-001's penal interest. Third, the information provided by CS 12-001 is consistent with evidence obtained elsewhere in this investigation where CS 12-001 was utilized, and/or substantial portions of CS 12-001's information have been corroborated through independent investigation, including recorded conversations, surveillance, and information from other confidential sources. For example, CS 12-001 provided information to case agents regarding his involvement with the DTO which included identifying his co-conspirators and techniques used by the DTO to avoid law enforcement detection. During subsequent debrief interviews with CS 12-001, s/he positively identified photographs of co-conspirators and agreed to cooperate with the United States government by providing testimony against the subjects in federal court when and if called upon. CS 12-001's information was corroborated through other confidential informants. Finally, CS 12-001 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed. CS 12-001 has a prior felony conviction for Conspiracy to Transport Stolen Goods and Stolen Motor Vehicles in

Interstate Commerce. CS 12-001 is cooperating in an attempt to earn sentencing consideration in a federal case.

4.      On numerous dates between October 2011 and 2012, CS 12-014 was interviewed and provided detailed information about the current and past drug-trafficking activities of subjects associated with this Drug Trafficking Organization (DTO), as well as with about individuals involved in the interstate transportation of stolen tractor-trailers which contained merchandise and food products. For several reasons, case agents believe CS 12-014 is reliable and credible. First, CS 12-014 has been providing information since October, 2011. Second, CS 12-014's information is substantially against CS 12-014's penal interest. Third, the information provided by CS 12-014 is consistent with evidence obtained elsewhere in this investigation where CS 12-014 was utilized, and/or substantial portions of CS 12-014's information have been corroborated through independent investigation, including recorded conversations, surveillance, and information from other confidential sources. For example, CS 12-014 provided information to case agents regarding his involvement with the DTO which included identifying his co-conspirators, techniques used by the DTO to avoid law enforcement detection. During subsequent debrief interviews with CS 12-014, s/he positively identified photographs of co-conspirators and agreed to cooperate with the United States government by providing testimony against the subjects in federal court when and if called upon. CS 12-014's information was corroborated through other confidential informants. Finally, CS 12-014 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed. CS 12-014 has prior misdemeanor convictions for possession of cannabis and receiving stolen property. CS 12-014 has a prior felony conviction for Conspiracy

to Transport Stolen Goods and Merchandise in Interstate Commerce. CS 12-014 is cooperating in an attempt to earn sentencing consideration in a federal case.

5.  On July 12, 2012, case agents met with CS 12-015 and discussed drug sources in the Milwaukee area. On numerous dates between July 2012 and April 2013, CS 12-015 was interviewed and provided detailed information about the current and past drug-trafficking activities of subjects associated with this Drug Trafficking Organization (DTO). For several reasons, case agents believe CS 12-015 is reliable and credible. First, CS 12-015 has been providing information since July 2012. Second, CS 12-015's information is substantially against CS 12-015's penal interest. Third, the information provided by CS 12-015 is consistent with evidence obtained elsewhere in this investigation where CS 12-015 was utilized, and/or substantial portions of CS 12-015's information have been corroborated through independent investigation, including recorded conversations, surveillance, and information from other confidential sources. CS 12-015 provided information to case agents regarding his involvement with the DTO which included identifying his co-conspirators and techniques used by the DTO to avoid law enforcement detection. During subsequent debrief interviews with CS 12-015, s/he positively identified photographs of co-conspirators and agreed to cooperate with the United States government by providing testimony against the subjects in federal court when and if called upon. CS 12-015 made more than three controlled buys at the direction of case agents, which led to a search warrant that resulted in the seizure of controlled substances and evidence of drug trafficking. CS 12-015's information also has been corroborated through other confidential informants. Finally, CS 12-015 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed. CS 12-015 has no prior convictions. CS 12-015 has not been charged, but could face federal charges related to

4

drug offenses, and is hoping for consideration from the court when charges are filed.

6.      On January 8, 2013, following execution of a search warrant at his/her residence, CS 13-001 met with case agents and discussed drug sources in the Milwaukee area. On numerous dates between January 2013 and April 2013, CS 13-001 was interviewed and provided detailed information about the current and past drug-trafficking activities of subjects associated with this Drug Trafficking Organization (DTO). For several reasons, case agents believe CS 13-001 is reliable and credible. First, CS 13-001 has been providing information since January 2013. Second, CS 13-001's information is substantially against CS 13-001's penal interest. Third, the information provided by CS 13-001 is consistent with evidence obtained elsewhere in this investigation where CS 13-001 was utilized, and/or substantial portions of CS 13-001's information have been corroborated through independent investigation, including recorded conversations, surveillance, and information from other confidential sources. For example, CS 13-001 provided information to case agents regarding his involvement with the DTO which included conducting recorded meetings with targets of this investigation, identifying his co-conspirators and techniques used by the DTO to avoid law enforcement detection. During subsequent debrief interviews with CS 13-001, s/he positively identified photographs of co-conspirators and agreed to cooperate with the United States government by providing testimony against the subjects in federal court when and if called upon. Finally, CS 13-001 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed. CS 13-001 has no felony convictions. CS 13-001 is cooperating in an attempt to earn consideration in a potential federal case.

5

Case 2:13-mj-00485-WEC   Filed 04/30/13   Page 6 of 20   Document 1

## III. PROBABLE CAUSE

7. In October 2011, CS 12-001 was interviewed by law enforcement concerning a traffic stop of Julio L. Cruz in Spring 2011. CS 12-001 identified Julio L. Cruz as a drug dealer and provided his telephone number at the time as 414-388-0821. During the interview, CS 12-001 stated that a Milwaukee Police Department narcotics detective whom CS 12-001 knew as "Willie" was protecting a drug dealer named Julio L. Cruz.

8. CS 12-001 stated that in Spring 2011, "Willie" had intervened when Julio L. Cruz and CS 12-001 were traffic stopped in Cruz's tow truck by a uniformed Milwaukee Police Department officer. According to CS 12-001, the vehicle smelled like marijuana and there was marijuana residue in the ashtray. Cruz had told CS 12-001 that an ounce of cocaine was hidden in the dashboard of the truck that day. During the stop, CS 12-001 stated that Cruz called a family member subsequently identified as Julio Cruz Jr., and stated that he needed to get ahold of another family member, "Willie," to let him know of the situation.

9. According to CS 12-001, the officers who stopped the tow truck searched the truck and CS 12-001 believed they requested a drug dog to search the vehicle. According to CS 12-001, the drug dog unit arrived, but the officer sent the unit away without performing a search of the vehicle. Then, CS 12-001 stated, a plain clothes officer arrived on the scene in a red Durango SUV. He spoke with one of the officers who had initiated the traffic stop. The officer then released Cruz from the scene of the stop without any further law enforcement action. CS 12-001 believed that "Willie" had somehow arranged for the officer to release them and not use the drug dog, which CS 12-001 felt kept the drugs from being discovered. The following day, Cruz told CS 12-001 that he had made "Willie" dinner because he had gotten Cruz out of trouble at the traffic stop.

10. Milwaukee Police Department records for January 24, 2011, indicate that Julio L. Cruz and CS 12-001 were traffic-stopped by Officers Eric Rom and Procopio Orlando at 5400 West Wright at 3:49 p.m., while driving a tow truck bearing Wisconsin license plate DG43309. The plate listed to Julio L. Cruz, 8/9/1970, 1664 South 56th Street, Milwaukee, WI, on a red 1999 Chevrolet Wrecker. The officers cleared the stop without making any arrests at 5:07 p.m.

11. On February 23, 2012, Police Officer Eric Rom was interviewed by Milwaukee Police Department Internal Affairs Division. Officer Rom recalled stopping Julio Cruz and CS 12-001 in a red tow truck on January 24, 2011. He recalled that the odor of marijuana coming from the passenger compartment. Officer Rom stated that he searched the vehicle for contraband but did not locate any. He checked several vehicle titles which were located in the vehicle for any reports of them being stolen. Officer Rom stated that a District 3 marked squad arrived at the traffic stop to determine if they needed additional assistance. The squad departed after a short period of time. Officer Rom recalled that two plain clothes Milwaukee Police Department officers in an unmarked vehicle arrived at the stop. Officer Rom spoke with one of the officers but he could not recall his name. Officer Rom stated he knew the officer and had seen him on previous occasions but could only recall he was a white male. According to Officer Rom, the plain clothes officer asked Officer Rom to discontinue the traffic stop and let the vehicle go. The officer explained that they had been following the truck from the southside and were conducting an investigation of the occupants. Officer Rom stated that he compiled with the request.

12. On February 23, 2012, Police Officer Procopio Orlando was interviewed by Milwaukee Police Department Internal Affairs Division. Officer Orlando recalled stopping Julio Cruz and CS 12-001 in a red tow truck on January 24, 2011. He recalled that the odor of marijuana coming from the passenger compartment. Officer Orlando searched the vehicle for contraband

7

but did not locate any. He checked several vehicle titles which were located in the vehicle for any reports of them being stolen. Officer Orlando stated that no plain clothes officers came to the scene.

13. In 2012, case agents obtained cellular telephone records for telephones associated with Julio L. Cruz, Julio Cruz, Jr. (a.k.a. "Julito,"), Officer Eric Rom, and Detective Willie Huerta (work and personal cell phones). These records were obtained over a number of months, as the review of the records of one individual often lead to the identification of the telephone number of another individual.

14. As the attached chart (Attachment A) depicts, Julio L. Cruz called Julio Cruz Jr. at 4:02 p.m., shortly after the traffic stop began at 3:49 p.m. Julio Cruz Jr. then called Detective Huerta's personal telephone. Prior to the termination of the traffic stop, there are numerous calls between Detective Huerta and Officer Rom, Detective James Henner (Detective Huerta's partner), and Julio Cruz Jr. Based on this phone pattern and the description of the red SUV at the scene by CS 12-001, the Milwaukee Police Department believed that Huerta's partner, Detective James Henner, went to the scene of the tow truck stop at the behest of Detective Huerta.

15. Milwaukee Police Department records indicated that Detective Huerta was not working on January 24, 2011. MPD is aware that at that time, Detective Henner and Detective Huerta were assigned to the Milwaukee HIDTA surveillance group, along with Detective Thomas Dineen and Detective Keith Dodd. Detectives Dineen and Dodd were assigned to work from 11:00 a.m., to 7:00 p.m., on January 24, 2011. Detective James Henner was assigned to work from 10:00 a.m., to 6:00 p.m. According to other individuals assigned to HIDTA, these four often drove together in a red SUV.

16. Milwaukee Police records reflect that Detective Dineen placed fuel into Milwaukee Police Department undercover vehicle #997, a 2001 red GMC Yukon SUV, on January 10, 19, and 31, 2011.

17. On April 18, 2012, Detective Thomas Dineen was interviewed by Milwaukee Police Department Internal Affairs Division. Detective Dineen stated that in January 2011, he worked with Keith Dodd, James Henner, and Willie Huerta. Detective Dineen stated that they used a maroon Yukon for surveillance at that time. Upon specific questioning, Detective Dineen did not recall the traffic stop or conducting an investigation involving a tow truck on January 24, 2011. Upon general questioning, Detective Dineen stated that informants get traffic stopped all the time. He stated that he would not request that a traffic stop of an informant be discontinued, as any additional charges on an informant would just make the individual more motivated to work and to be a better informant.

18. A check of MPD tow lot records revealed that the tow truck used by Julio L. Cruz on January 24, 2011, was now being used by a Marco Soto to remove vehicles from the City of Milwaukee Tow Lot. In accordance with tow lot regulations, any vehicle accessing the tow lot needed to be registered.

19. On March 7, 2013, a Milwaukee Police Officer received consent from Soto to inspect the tow truck for any violations of city or state laws or regulations. The tow truck license plate was DG83014 and the Vehicle Identification Number was verified as being 1GBJC34R6XF030976. The tow truck was not currently registered, but was still listed to Julio L. Cruz. Officers located a Wisconsin license plate DG43309 inside the tow truck. This was the same plate Officer Rom observed on the same tow truck on January 24, 2011. Soto advised that he had purchased the tow truck from Julio Cruz for $13,000. The inspection revealed that there is a void under the steering

9

wheel airbag, which was consistent with the information provided by CS 12-001 and CS 13-001 about Julio L. Cruz using that space to store narcotics. Investigators believed the space could easily be used to conceal an ounce of cocaine. Soto was advised of the need to register the vehicle and update the information to reflect that he was the current owner. Soto stated he would address those issues.

20. A review of Milwaukee Police Department records reflects that neither Julio L. Cruz nor Julio Cruz, Jr. is a registered informant of Detective Willie Huerta. However, another officer indicated that Julio L Cruz was not a confidential informant, but did occasionally provide information to Detective Huerta.

21. On Monday, December 5, 2011, CS 12-001, agreed to make a controlled drug purchase from Julio L. Cruz. At the direction of the case agents, CS 12-001 made contact with Julio L. Cruz using text messages and telephone calls to arrange a meeting later in the evening at 1664 South 56th Street, West Allis, Wisconsin. During the calls and texts, CS 12-001 agreed to purchase a half ounce quantity of cocaine from Julio L. Cruz. Before driving to Cruz's residence, CS 12-001's person and vehicle were searched for any contraband and/or money with negative results. CS 12-001 was provided with a body recorder and $600 of pre-recorded buy money. CS-12-001 was then surveilled driving to at 1664 South 56th Street. At the residence, he met with Cruz who had just exited the residence. Case agents observed the two walking together into the garage at 1664 South 56th Street. CS-12-001 later stated that while in the garage, s/he gave the buy money to Julio L. Cruz and CS 12-001 received the bag of cocaine from Cruz, who had the cocaine in his jacket pocket. CS 12-001 then met with case agents at a pre-determined location and turned over the suspected cocaine to case agents. CS 12-001's person and vehicle were again searched for contraband and/or money with negative results. Case agents conducted a field test

10

on the suspected cocaine, which tested positive for cocaine at a total weight of 13.7 grams.

22.     On Tuesday, January 10, 2012, CS 12-001 again agreed to make a controlled buy of cocaine from Julio L. Cruz at the direction of case agents. CS 12-001 made contact with Cruz to arrange to meet Cruz at his residence, 1664 South 56th Street. CS 12-001's person and vehicle were searched for any money and/or contraband with negative results. CS 12-001 was provided with a body recorder and $600 in pre-recorded buy money. Upon CS 12-001's arrival at 1664 South 56th Street, case agents observed Julio L. Cruz in the garage of the residence, after previously having been observed walking repeatedly between the house and garage. CS-12-001 met with Julio L. Cruz at the garage. Surveillance agents observed Julio L. Cruz get into CS's vehicle and then saw Cruz drive CS 12-001's vehicle northbound in the alley between 56th and 55th Sts. Case agents observed Julio L. Cruz park the car in the 5500 block of West Greenfield Avenue. A short time later, agents Cruz returned to the garage at 1664 South 56th Street and exited CS 12-001's vehicle. CS 12-001 and Cruz then met again.

23.     CS 12-001 met with case agents at a pre-determined location, where s/he turned over a baggie containing suspected cocaine. CS 12-001's person and vehicle were again searched for contraband/money with negative results. CS 12-001 told case agents that Cruz was given the pre-recorded money in the garage at 1664 South 56th Street, and that CS 12-001 then observed Julio L. Cruz make a phone call. CS 12-001 stated that after the phone call, Cruz took CS 12-001's vehicle and drove up the block to get the half ounce of cocaine. CS 12-001 knows from past drug deals with Cruz that Cruz has a relative who resides on Greenfield Ave. who sometimes stores cocaine for Cruz. Cruz returned after a few minutes. Cruz left the cocaine on the sun visor in CS 12-001's vehicle. CS 12-001 accompanied case agents to the 5500 block of Greenfield Avenue and pointed to the address of 5509 West Greenfield Avenue as being the apartment building that

11

Julio L. Cruz has gone to obtain cocaine in the past. In the past year, CS 12-001 had been to that address and observed Julio L. Cruz with nine ounces of cocaine in the garage area of the building at 5509 W. Greenfield Ave. Case agents conducted a field test on the suspected cocaine which tested positive for cocaine at a total weight of 14.0 grams.

24. On July 12, 2012, CS 12-015 was interviewed by law enforcement officers. CS 12-015 stated that a subject, who after several additional months of investigation became CS 13-001, and others supplied Julio L. Cruz with cocaine which Cruz distributed. CS 12-015 admitted that s/he has known CS 13-001 for three or four years and that CS 12-015 has sold CS 13-001 at least a half -dozen kilos of cocaine.

25. At that interview, CS 12-015 described a conversation s/he had with CS 13-001 when they were watching a story about a federal indictment on television. CS 13-001 told CS 12-015 that Julio L. Cruz was being given information by a high ranking police officer who was working on a federal task force investigating drug dealing. According to CS 13-001, the officer was of Hispanic descent, had been an officer for a while, and had helped Julio L. Cruz previously.

26. During the same conversation, Julio L. Cruz further told CS 13-001 that the same officer had told him the "east" was very "hot." Based on my experience, I am aware that the "east" generally refers to the eastside of Milwaukee, east of I-43, west of the Milwaukee river, north of downtown and south of Capitol Drive, and that "hot" means being targeted by law enforcement. Based on my training and experience, the eastside of Milwaukee is an area known to include a gang known as the Eastside Mafioso, which primarily consisted of individuals who are of Puerto Rican descent.

27. On July 24, 2012, at the direction and control of law enforcement, CS 12-015 arranged a meeting with CS 13-001. CS 12-015 agreed to wear a concealed recording device to record the

12

conversation. The meeting was surveilled by officers. Officers observed CS 13-001's known vehicle arriving at the meeting location. Officers then observed CS 13-001 exit the vehicle and meet with CS 12-015 for approximately 20 minutes. Following the meeting CS 12-015 met with investigators who took custody of the recorder.

28. I reviewed the recording of this conversation between CS 12-015 and CS 13-001. During the conversation, CS 12-015 and CS 13-001 discussed subjects who had been arrested, as well as individuals whom they thought were cooperating with law enforcement. CS 12-015 stated that "Julio" knew somebody in law enforcement who could give them information. CS 13-001 told CS 12-015 that a year ago, Cruz was traffic stopped and had drugs hidden in the steering wheel airbag of his vehicle. The officer searched the whole truck but did not find the drugs, so he called for a drug dog. Cruz "called his guy" who was able to call off the use of the drug dog. CS 13-001 stated that because the officer intervened in the traffic stop, the officer was transferred to another division. CS 13-001 stated the officer took a "hit on the chin to keep my nigger clean. This is his career…".

29. CS 13-001 further stated, "and anytime he ever heard anything, you know. You guys step back…" CS 13-001 made a statement that the officer was the highest ranking official at the DEA office in Milwaukee. "He was the highest ranking, he worked with the feds, he worked with the marshals." CS 13-001 further stated, "All the intel information, he always let us know ahead of time, nigger, what was good, so we was good." CS 13-001 described the officer of as being of Puerto Rican descent, who was "OG" and that he "grew up in the hood" and "he just went blue suit."

30. Based on my experience, I am aware that "OG" is a common expression meaning "Original Gangster" and by the "hood" CS 13-001 meant that the officer grew up in the same

13

area of Milwaukee and had the same experiences as they did, but then became a police officer (in a blue suit).

31.    I have spoken to Milwaukee Police Lt. Salazar, who knows additional personal information about Detective Huerta. Lt. Salazar is aware that Detective Huerta is of Puerto Rican descent. MPD records reflect that Detective Huerta attended Riverside High School on Locust Avenue, which is in an area generally referred to as the eastside of Milwaukee. I am also aware that Detective Huerta was transferred from the Milwaukee HIDTA in Spring 2012 because of the investigation into this traffic stop.

32.    In January 2013, CS 13-001 was interviewed by investigators. CS 13-001 stated that s/he would obtain cocaine from F.B. and then CS 13-001 would provide half the cocaine to Julio L. Cruz. CS 13-001 stated that s/he obtained more than two kilograms of cocaine from F.B. during the time period of January 2011 to January 2013. During the same time frame, CS 13-001 provided Julio L. Cruz with approximately one kilogram of cocaine. CS 13-001 stated that they obtained the cocaine on consignment from F.B. CS 13-001 stated that they had a two-to- three day window to pay back F.B.

33.    CS 13-001 recalled that about a year ago, Julio L. Cruz had told CS 13-001 that he had been traffic stopped in his tow truck. Cruz told CS 13-001 about this stop one or two days after the stop had occurred. Cruz then retold the incident in more detail a week or two later. Cruz told CS 13-001 that the person he was with (believed to refer to CS 12-001) was smoking marijuana in the truck, so the cab smelled like marijuana. The officer was bringing a drug dog to the traffic stop to search the vehicle. CS 13-001 stated that Cruz told him/her that Cruz either called "Will" directly or called "Julito" (Julio Cruz Jr.) who then called "Will." Cruz stated that after calling

14

"Will," they were released from the traffic stop because "Will" had talked to the officers and had them let them go.

34. On January 21, 2013, at the direction and control of law enforcement, CS 13-001 met with Julio L. Cruz. CS 13-001 agreed to wear a body recorder to capture the conversation with Julio L. Cruz. The meeting was surveilled by law enforcement. Prior to the meeting, CS 13-001 stated that Julio L. Cruz had sent CS 13-001 a text from 414-510-3702. The text was photographed by investigators. Officers searched both CS 13-001's person and vehicle for contraband and currency. None was located. CS 13-001 was followed the residence of Julio L. Cruz, 1664 South 56th Street, West Allis, Wisconsin.

35. A review of the recording of this meeting revealed that Julio L. Cruz told CS 13-001 that he was recently with "Will," Julio Cruz (a.k.a. Julito), and others at a bar called Spin in Milwaukee. Julio L. Cruz stated that he was with his friends who are police officers and sheriff deputies. While there, Cruz told CS 13-001, he met and started dating a woman he described as an armed police officer with a badge who worked in a sensitive crimes unit. Julio L. Cruz stated that he told the female officer everything about his past. During the meeting, CS 13-001 said that the police had traffic stopped CS 13-001 and taken money and marijuana from him, but then just drove off. Cruz asked CS 13-001 for details about the officers who had stopped him/her, as Cruz would reach out to his police contacts and find out what had happened. Julio L. Cruz told CS 13-001 it was very important how "these officers were dressed" because detectives wear suits but narcotics officers don't have to wear them. Cruz stated he could help because, "I could call Will and that's his whole department."

36. During this meeting, Cruz also told CS 13-001 that he had recently been traffic-stopped between 11th and 12th Streets on National Avenue. Cruz told CS 13-001 that he called "Will"

15

and handed the phone to the officer who stopped him. The officer then let Cruz go. To date, case agents have been unable to corroborate the details of this stop.

37. On January 29, 2013, investigators provided CS 13-001 with undercover Wisconsin license plate number 308-KRD to provide to Julio L. Cruz, as the license plate of the vehicle which had stopped CS 13-001 and taken his money and marijuana. During an exchange of text messages between CS 13-001 and Cruz, CS 13-001 indicated that the unmarked vehicle which had stopped CS 13-001 had a license plate of 308-KRD. Cruz then text back, "Gotcha type, color, year will help." CS 13-001 responded with, "tanish/gold crown vic." Cruz responded with, "I'll stop and look…They won't b in that if there looking..but ill look for u."

38. On February 5, 2013, at the direction and control of case agents, CS 13-001 placed a recorded telephone call to Julio L. Cruz at 414-510-3702. The call was not answered, but Cruz called CS 13-001 back. A portion of the recorded conversation follows: CS 13-001 asked, "So you went to check on that" (referring to the license plate CS 13-001 had provided to Cruz on January 29, 2013). Julio Cruz responded,

> Yes. Yes. That has to be a whole different area. Because that area right there where I'm talking. We're talking Blazer, Yukon, normal cars. Not talking nothing out of the ordinary. Something that we would suspect, you're not gonna see it. So, um, I got an inside on it. They said, Go over here and I said there's no way they can even attempt to do something like that because it would be on file who did it. Go over here check. I said look this is the situation… If he tells me what's up, its what's up. He says you got faith. I says, man, one hundred. He says, Let me see what I can do. And um, nothing. There's nothing up anywhere. Its either, and I don't mean to disrespect, he's either with the boys and that's why it's not on there or there's just nothing there…He says, whatever it is keep it clean. Keep it cool and your good. I said it's all good. Thank you very much.

39. Based on my training and experience, I believe that Julio L. Cruz had contacted someone inside the police department to obtain details concerning the traffic stop of CS 13-001. Cruz was instructed by that person to look at cars that were parked in an area in order to locate the

16

vehicle CS 13-001 had described. Cruz was also told that undercover vehicles were not going to be parked in that location because they would be in a different area. Cruz further stated, "There's no way they can even attempt to do something like that because it would be on file who did it." Cruz was telling CS 13-001 that there would be a record if the "inside" person checked further on the vehicle. The "inside" person asked if Cruz had "faith" (meaning believed what CS 13-001 was telling Cruz about the stop). Cruz vouched for CS 13-001 by stating he was "100." The "insider" stated "Let me see what I can do," meaning he/she would check further into the traffic stop. The "insider" then reported back that CS 13-001 was either cooperating with the "boys" (meaning law enforcement) or there was no investigation of CS 13-001. The "insider" then warned Cruz to "keep it clean," meaning not to take any chances.

40.  In June 2012, CS 12-014 was interviewed by law enforcement officers. CS 12-014 identified Julio L. Cruz as an individual whom he knows who deals in controlled substances. Julio L. Cruz told CS 12-014 about a conversation Julio Cruz, Jr. (a.k.a. "Julito") had with him. Julito told Julio L. Cruz that he had received information from "Willie," who works at the police department, that the police were investigating Julio L. Cruz's involvement in vehicle thefts and drug dealing. Julio L. Cruz instructed CS 12-014 not to call him using his old number because of the police investigation and that Julio L. Cruz was getting a new telephone number. CS 12-014 has stated that both of the Cruz's were of Puerto Rican descent. Shortly thereafter, Julio L. Cruz stopped using his previous cellular telephone number and started using a new number.

41.  On January 13, 2013, Julio L. Cruz was arrested by the West Allis Police Department for Domestic Violence/Disorderly Conduct. Cruz told arresting officers that he had a cousin who worked at the Milwaukee Police Department.

17

## IV. CONCLUSION

42. Based on the foregoing, I submit that there is probable cause to believe that Willie Huerta has committed the offense of obstruction of justice, in violation of Title 18, United States Code, Section 1512(c)(2) and request that a criminal complaint and arrest warrant be authorized.

Attachment A

| Date | Time | Duration | Caller's Number | Caller's Name | Recipient's Number | Recipient's Name | Notes |
|---|---|---|---|---|---|---|---|
| 01/24/2011 | 16:02:29 | 0:07:15 | (414) 698-3157 | Julio L. Cruz | (414) 899-1090 | Julio Cruz, Jr. | |
| 01/24/2011 | 16:10:11 | 0:01:41 | (414) 899-1090 | Julio Cruz, Jr. | (414) 698-8996 | Willie Huerta (personal) | |
| 01/24/2011 | 16:12:25 | 0:00:57 | (414) 698-3157 | Julio L. Cruz | (414) 899-1090 | Julio Cruz, Jr. | |
| 01/24/2011 | 16:15:59 | 0:00:02 | (414) 899-1090 | Julio Cruz, Jr. | 1-(414) 698-3157 | Julio L. Cruz | |
| 01/24/2011 | 16:17:14 | 0:01:14 | (414) 698-3157 | Julio L. Cruz | (414) 899-1090 | Julio Cruz, Jr. | |
| 01/24/2011 | 16:22:00 | 0:02:00 | (414)788-7321 | Willie Huerta (work) | (414) 350-1098 | James Henner | |
| 01/24/2011 | 16:24:29 | 0:04:11 | (414)788-7321 | Willie Huerta (work) | (414) 899-1090 | Julio Cruz, Jr. | |
| 01/24/2011 | 16:26:00 | 0:02:00 | (414)350-1098 | James Henner | (414)788-7321 | Willie Huerta (work) | Call Waiting |
| 01/24/2011 | 16:27:00 | 0:02:00 | (414)788-7321 | Willie Huerta (work) | (414)899-1090 | Julio Cruz, Jr. | Call Waiting |
| 01/24/2011 | 16:28:00 | 0:01:00 | (414)350-1098 | James Henner | (414)788-7321 | Willie Huerta (work) | Call Waiting |
| 01/24/2011 | 16:28:46 | 0:01:03 | (414) 899-1090 | Julio Cruz, Jr. | (414) 698-3157 | Julio L. Cruz | |
| 01/24/2011 | 16:29:00 | 0:01:00 | (414)788-7321 | Willie Huerta (work) | (414) 559-7587 | Officer Eric Rom | |
| 01/24/2011 | 16:31:00 | 0:03:00 | (414)788-7321 | Willie Huerta (work) | (414) 899-1090 | Julio Cruz, Jr. | |
| 01/24/2011 | 16:34:13 | 0:01:19 | (414) 899-1090 | Julio Cruz, Jr. | (414) 698-3157 | Julio L. Cruz | |
| 01/24/2011 | 16:35:00 | 0:01:00 | (414) 899-1090 | Julio Cruz, Jr. | (414)788-7321 | Willie Huerta (work) | |
| 01/24/2011 | 16:37:00 | 0:04:00 | (414) 899-1090 | Julio Cruz, Jr. | (414)788-7321 | Willie Huerta (work) | Call Waiting |
| 01/24/2011 | 16:59:15 | 0:00:50 | (414) 899-1090 | Julio Cruz, Jr. | (414) 698-3157 | Julio L. Cruz | |
| 01/24/2011 | 18:11:00 | 0:01:00 | (414) 788-7321 | Willie Huerta (work) | (414) 899-1090 | Julio Cruz, Jr. | |
| 01/24/2011 | 18:38:42 | 0:00:52 | (414) 899-1090 | Julio Cruz, Jr. | (414) 788-7321 | Willie Huerta (work) | |
| 01/24/2011 | 19:24:42 | 0:00:00 | (414) 899-1090 | Julio Cruz, Jr. | (414) 698-8996 | Willie Huerta (personal) | |
| 01/24/2011 | 19:25:40 | 0:00:00 | (414) 899-1090 | Julio Cruz, Jr. | (414) 698-8996 | Willie Huerta (personal) | |
| 01/24/2011 | 19:30:55 | 0:01:58 | (414) 788-7321 | Willie Huerta (work) | (414) 899-1090 | Julio Cruz, Jr. | |
| 01/24/2011 | 20:07:40 | 1:05:23 | (414) 899-1090 | Julio Cruz, Jr. | (414) 788-7321 | Willie Huerta (work) | |
| 01/24/2011 | 21:31:30 | 0:00:24 | (414) 899-1090 | Julio Cruz, Jr. | (414) 698-3157 | Julio L. Cruz | |

The telephone numbers were identified as follows:
(414) 698-3157: Julio L. Cruz (based on information provided by CS 12-001)
(414) 899-1090: Julio Cruz, Jr. (based on subscriber information, Wisconsin Corporation records and CCAP)
(414) 698-8996: Willie Huerta (personal)(based on subscriber records)
(414)788-7321 : Willie Huerta (work) (based on MPD records)
(414) 350-1098: James Henner (based on information provided by Det. Dineen in April 2012)